Donald R. KITTEN, Plaintiff-Appellant,†

v.

State of WISCONSIN DEPARTMENT OF WORKFORCE DEVELOPMENT, Defendant-Respondent.

Court of Appeals

*No. 00–3562. Submitted on briefs June 6, 2001.—Decided August 8, 2001.*

2001 WI App 218

(Also reported in 634 N.W.2d 583.)

† Petition to review granted 10-23-01.

On behalf of the plaintiff-appellant, the cause was submitted on the brief of *Phil Elliott, Jr.*, of *Elliott, Elliott & Staskunas*, West Allis.

On behalf of the defendant-respondent, the cause was submitted on the brief of *David C. Rice*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Donald R. Kitten appeals from a circuit court order affirming a hearing examiner's decision that he unlawfully discriminated against Spencer S. Cenname contrary to Wis. Stat. § 106.04 (1997–98),[1] the Wisconsin Open Housing Act (WOHA). The hearing examiner[2] found, and the circuit court agreed, that Kitten had sought to exact from Cenname a different or more stringent price, terms or conditions for the rental of a housing unit because of a disability within the meaning of the WOHA. We agree. Therefore, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[2] For clarity, we note that Wisconsin refers to persons who preside over administrative proceedings as hearing examiners, not administrative law judges. *See* Wis. Stat. § 111.39.

## Relevant Law

¶ 2. Wisconsin's Open Housing Act provides in relevant part:

It is unlawful for any person to discriminate:

(a) By refusing to sell, rent, finance or contract to construct housing or by refusing to negotiate or discuss the terms thereof.

(b) By refusing to permit inspection or exacting different or more stringent price, terms or conditions for the sale, lease, financing or rental of housing.

WIS. STAT. § 106.04(2). Wisconsin law defines "disability" and "discriminate" as follows:

(g) "Disability" means a physical or mental impairment that substantially limits one or more major life activities, a record of having such an impairment or being regarded as having such an impairment. . . .

(h) "Discriminate" means to . . . treat a person . . . unequally in a manner described in sub. (2) . . . because of . . . disability. . . .

Section 106.04(1m). WISCONSIN STAT. § 100.264(1)(c) defines "major life activity" as "self-care, walking, seeing, hearing, speaking, breathing, learning, performing manual tasks or being able to be gainfully employed."

## Facts

¶ 3. The following are the findings of fact made by the Wisconsin Department of Workforce Development (DWD) hearing examiner. On September 8, 1998, Cenname called Kitten to inquire about an apartment located at 317 South Brookfield Road that Kitten had advertised for rent. During the conversation, Kitten

told Cenname that he must have a pretty good job to be able to pay $925 per month for rent. Cenname told Kitten that he in fact was not working, but he did have a financial statement and a letter from his banker guaranteeing his income and explaining his money situation. The two made arrangements to meet on September 9, 1998. Kitten told Cenname to bring his checkbook because the apartments "go fast" and Cenname might want to give Kitten a check right away.

¶ 4. On September 9, 1998, Cenname met Kitten at the apartment. After viewing the apartment, Cenname told Kitten that he wanted to rent it. Cenname and Kitten then sat down to discuss Cenname's financial situation. Cenname gave Kitten a photocopy of an account statement from Merrill Lynch that showed that Cenname had $40,446 in Merrill Lynch accounts as of July 31, 1998. Cenname provided Kitten with a letter from his father (also his financial advisor), August Cenname, written on Merrill Lynch stationery that explained Cenname's current account balances and that he received $3000 per month after taxes. The letter also explained that Cenname's account balances had steadily increased over the thirteen years that he had been a customer of Merrill Lynch and that he had always promptly paid his Visa account. Cenname showed Kitten a handwritten document that had bank account numbers, names and telephone numbers of people who could be contacted to provide personal and financial references for him. Based on the information provided by Cenname, Kitten began to write up a lease agreement.

¶ 5. While Kitten was writing up the lease agreement, he asked Cenname where he lived. Cenname did not want to tell Kitten that he was currently living at Rogers Memorial Hospital, where he was being treated

for an eating disorder, so he told Kitten that he was living with friends. Kitten continued to ask Cenname about where he was living; eventually Cenname felt compelled to admit that he was living at Rogers Memorial Hospital and that he was being treated for an eating disorder. Kitten told Cenname that he knew from his "caller ID" device that Cenname's first call to him had been from the hospital. Kitten told Cenname that Cenname looked like he did not eat enough. Cenname and Kitten then had a short discussion regarding Cenname's eating disorder.

¶ 6. As Kitten went through the lease with Cenname, he pointed out that Cenname would be required to pay Kitten a deposit of one month of rent in advance and $1000 for a security deposit. Kitten explained to Cenname that any money paid to Kitten on September 9, 1998, would not be refunded unless Kitten denied Cenname occupancy. Cenname signed the completed lease form and gave Kitten a check for $1925 to cover the first month's rent and the security deposit. The lease was for one year and began October 1, 1998. Cenname understood that Kitten planned to have a credit check run on him before Kitten would sign the lease. However, when Cenname asked Kitten about the requirement, Kitten indicated that he did not think that it would be a problem. Before Cenname left, he asked Kitten "where do we stand," and Kitten said the apartment was Cenname's and directed Cenname to call him a week before he planned to move into the apartment. Cenname asked for a copy of the lease that he had signed. Kitten told Cenname that he would mail him a copy.

¶ 7. On September 11, 1998, Kitten received a verbal credit report for Cenname. The report revealed that Cenname's credit history was brief, but good. On

September 14, 1998, Kitten cashed Cenname's check for the first month's rent and the security deposit. Kitten did not attempt to contact Cenname during the period from September 9, 1998, through September 26, 1998. On September 27, 1998, Cenname called Kitten to let him know that he planned to move into the apartment on October 2, 1998. Cenname asked about getting into the apartment and also asked why Kitten had not sent him a copy of the lease. Kitten told Cenname that he was concerned that Cenname might go back into the hospital and that Kitten would not be able to get his rent money. Kitten told Cenname that he would "feel better" if Cenname paid Kitten six months' rent in advance. Kitten did not think that paying the money should be a problem for Cenname since Cenname had over $40,000 in his accounts at Merrill Lynch. Cenname was very nervous and confused by Kitten's request for six months of rent in advance. Cenname agreed to pay six months' rent in advance because he was afraid that if he did not agree to Kitten's request, Kitten would not rent to him. Cenname asked Kitten to fax a copy of the lease to him at Rogers Memorial Hospital. Kitten then made arrangements to meet Cenname at the apartment on October 2, 1998.

¶ 8. On September 27, 1998, Cenname received a message that he should call Kitten. Cenname spoke with Kitten again by telephone on September 28, 1998. In this phone conversation, Kitten arranged to change the meeting time on October 2, 1998, and then asked Cenname if he could call Cenname's doctor. This made Cenname very nervous and he believed that if he did not let Kitten speak to his doctor, Kitten would not rent the apartment to him. Cenname told Kitten that he would have his doctor call Kitten. Kitten asked Cenname to tell him the name of his doctor and Cenname

complied. Cenname then told Kitten that he was uncomfortable with paying Kitten six months' rent in advance. Kitten reiterated his concern that Cenname would have a relapse and go back into the hospital. Kitten also stated that he was concerned that Cenname would pay the hospital first and that Kitten would not be able to get his rent money. Although Cenname did not directly state to Kitten that he would not pay an additional six months' rent in advance, Cenname made it clear to Kitten that he was not happy with the request for an additional six months' rent. Cenname then reiterated his request that a copy of the lease be faxed to him at the hospital.

¶ 9. On September 29, 1998, Kitten called Cenname's doctor and left a telephone message for the doctor to return his call so that Kitten could speak to him about Cenname. The doctor's office manager heard Kitten's telephone message and contacted Cenname to see if he wanted to give permission to the doctor to discuss his medical condition with Kitten. Cenname was surprised and upset to find out that Kitten had called his doctor's office without Cenname's permission or knowledge. Cenname refused to grant the doctor permission to discuss his medical condition with Kitten. As a result of Cenname's decision, no one from the doctor's office contacted Kitten.

¶ 10. On September 29, 1998, after Cenname spoke to the office manager, he called Kitten. Cenname told Kitten that it was inappropriate for him to call Cenname's doctor and that Cenname was upset about his actions. Kitten insisted that he needed to speak to Cenname's doctor and that he needed the six months' rent paid in advance. Cenname again told Kitten that Kitten's actions were inappropriate. Cenname ended

669

the conversation by again asking Kitten to fax him a copy of the lease to Rogers Memorial Hospital.

¶ 11. After this conversation, Kitten faxed a copy of the lease that Cenname had signed on September 9, 1998. The lease agreement still did not have Kitten's signature on it. On September 30, 1998, Cenname called Kitten and told him that he would not pay six months' rent in advance and that Kitten did not have Cenname's permission to speak to his doctor. Kitten insisted that it was his right to inquire about Cenname's medical condition because Kitten had concerns and needed to protect the tenants in the other units. Kitten said that his sister was a nurse and that she told Kitten that Cenname's condition involved some depression. Kitten then described a hypothetical situation in which he came to the apartment complex and found Cenname in his car with the garage door closed and the exhaust fumes running from his car. Kitten told Cenname that such a situation would damage the rental unit. From listening to Kitten's hypothetical, Cenname determined that Kitten was trying to ask if he was suicidal. Cenname told Kitten that he was not suicidal. Cenname asked Kitten if speaking to his doctor was a condition of renting the apartment. Kitten said, "No, not really."

¶ 12. Cenname told Kitten that it was unreasonable to ask for six months' rent in advance. Cenname asked Kitten why he had not signed the lease. Kitten told Cenname that since Cenname had signed the lease, he had to pay the rent. Kitten then said that since Kitten had not signed the lease, he was not obliged to let Cenname rent the apartment. Cenname insisted that since Kitten had cashed his check that Kitten had to abide by the original terms of the lease. Kitten continued to insist that Cenname pay him six months'

rent in advance. Cenname told Kitten that if he wanted more financial information, he should talk to Cenname's financial advisor. Kitten laughed and said, "That's your father." Cenname said, "That's right," and gave Kitten his parents' home telephone number in Columbus, Ohio, so Kitten could contact his father.

¶ 13. On September 30, 1998, Kitten called Cenname's parents' home. Kitten expressed his concerns to Cenname's mother because his father was not home. Kitten said that in his rental units the garages were attached and that if something happened the gas would enter the other units. Cenname's mother asked Kitten if he was concerned that Cenname would attempt to commit suicide. Kitten responded, "Yes." Cenname's mother told Kitten that suicide might have been an issue for Cenname at one time, but that it no longer was an issue. Kitten asked Cenname's mother if she and her husband would co-sign the lease in case there was a need for Cenname to return to the hospital. She assured Kitten that Cenname had a guaranteed income of $36,000 per year after taxes; nonetheless, she agreed to co-sign, telling Kitten that he had to let her son know.

¶ 14. On September 30, 1998, Cenname again called Kitten, at which time Kitten told Cenname that he had spoken to Cenname's mother because his father was not available. Kitten quoted Cenname's mother as having said that her son should "choose his poison" between paying six months' rent in advance or having his parents co-sign the lease. Kitten asked Cenname which choice he was going to make. Cenname told Kitten that he needed time to think about it.

¶ 15. Afterwards, Cenname called his mother, who denied having told Kitten that Cenname should "choose his poison." After speaking to his mother, Cen-

name called the fair housing office that he had contacted earlier in the week. From his conversation with the fair housing office, Cenname understood that they wanted him to agree to pay six months' rent in advance to Kitten and to tape record the meeting scheduled with Kitten on October 2, 1998. As a result of his conversation with the fair housing group, Cenname called Kitten a third time on September 30, 1998, and told Kitten that he would pay the six months' rent in advance.

¶ 16. After telling Kitten this, Cenname discussed the situation with a family attorney and with the treatment staff at Rogers Memorial Hospital. Cenname then decided that he would not go through with the fair housing group's suggestion. Instead, on October 1, 1998, Cenname called Kitten and told him that he would not pay six months' rent in advance, and conversely, he had decided to hold Kitten to the original agreement. Kitten told Cenname not to show up on Friday for the planned meeting if he was not going to pay the six months' rent in advance. Cenname told Kitten that if the deal required him to pay six months' rent in advance, "the deal [was] off." Kitten agreed that "the deal [was] off." Cenname asked Kitten to return his money. Kitten told Cenname that he would not send his money back because he planned to use the money for the unit's rent for the month of October. Kitten raised his voice to Cenname and told him that he did not have to return the money because Cenname signed the lease. Cenname did not get his money back, in addition, Cenname incurred a variety of costs related to this situation.[3]

___

[3] Cenname incurred several costs as a result of this situation, among them: $8000 in additional hospital costs, $2700 more in rent over a one-year period than he would have had to

¶ 17. Other relevant findings made by the hearing examiner were that on September 30, 1998, Kitten received the written credit report about Cenname. The report was short, but did not show a bad credit history. Notably, Kitten never mentioned to Cenname or Cenname's mother that Cenname's brief credit history concerned him. Kitten did not usually ask other potential renters for six months' rent in advance or for permission to speak to their doctors before agreeing to rent to them.

## Standard of Review

¶ 18. We begin with a discussion of the appropriate standard of review. A hearing examiner's factual findings will be upheld if supported by substantial evidence. WIS. STAT. § 227.57(6). Kitten contends that there is insufficient evidence to support the hearing examiner's findings of discrimination. Kitten claims that Cenname's condition does not rise to the level of a disability under the WOHA and, therefore, Kitten could not have discriminated against him within the meaning of the WOHA.

¶ 19. Claims of insufficiency of the evidence are reviewed under the substantial evidence test because they involve the hearing examiner's determination of contested facts. *See Robertson Transp. Co. v. PSC*, 39 Wis. 2d 653, 658–59, 159 N.W.2d 636 (1968). When the sufficiency of the evidence is challenged, we are limited to the question of whether there is substantial evidence to support the hearing examiner's decision. *State ex rel.*

pay if he had been able to live in Kitten's unit, $48.67 for disconnection of the phone service he had previously arranged, and $200 in legal fees.

*Thompson v. Riveland*, 109 Wis. 2d 580, 585–86, 326 N.W.2d 768 (1982). The hearing examiner has leeway in determining and drawing inferences from conflicting evidentiary facts. *Milwaukee County v. DILHR*, 48 Wis. 2d 392, 399, 180 N.W.2d 513 (1970). We must affirm the findings of fact made by the hearing examiner if they are supported by substantial evidence in the record. *Muskego-Norway Consol. Schs. Joint Sch. Dist. No. 9 v. Wis. Employment Relations Bd.*, 35 Wis. 2d 540, 562, 151 N.W.2d 617 (1967). Substantial evidence is the quantity and quality of evidence which a reasonable person could accept as adequate to support a conclusion. *State ex rel. Eckmann v. DHSS*, 114 Wis. 2d 35, 43, 337 N.W.2d 840 (Ct. App. 1983). Where there are two conflicting views of the evidence, each of which may be sustained by substantial evidence, it is for the hearing examiner to determine which view of the evidence it wishes to accept. *Robertson Transp. Co.*, 39 Wis. 2d at 658. If more than one reasonable inference can be drawn from the facts, the drawing of that inference is still a finding of fact and conclusive on review. *Sauerwein v. DILHR*, 82 Wis. 2d 294, 300, 262 N.W.2d 126 (1978).

¶ 20. Further, it is well established that it is the function of the hearing examiner, not the reviewing court, to determine the credibility of witnesses and the weight of the evidence. *Eastex Packaging Co. v. DILHR*, 89 Wis. 2d 39, 745, 279 N.W.2d 248 (1979). We adhere to the hearing examiner's credibility determination because the hearing examiner is in the best position to assess the witnesses' demeanor and to weigh any potential bias or interest the witnesses might have in the outcome. Wis. Stat. § 227.45(1) (an administrative hearing examiner is to apply "[b]asic principles of

relevancy, materiality and probative force"). Indeed, the level of deference is such that the hearing examiner's findings must be upheld even if they are against the great weight and clear preponderance of the evidence. *L & H Wrecking Co. v. LIRC*, 114 Wis. 2d 504, 508, 339 N.W.2d 344 (Ct. App. 1983).

██

¶ 21. Finally, we acknowledge that there are contested facts; however, because our review is based on the substantial evidence test, we need only review evidence that would support the hearing examiner's determination. *Abbyland Processing v. LIRC*, 206 Wis. 2d 309, 318, 557 N.W.2d 419 (1996). Thus, despite the evidence introduced by Kitten that could have permitted contrary findings of fact, if a reasonable fact finder could have reached the conclusions reached by the hearing examiner, we must affirm such findings.

¶ 22. Once the facts are established, however, the determination of whether those facts fulfill the statutory standard is a legal conclusion. *Keeler v. LIRC*, 154 Wis. 2d 626, 632, 453 N.W.2d 902 (Ct. App. 1990). Therefore, we will review the hearing examiner's determination that Kitten violated the WOHA as a conclusion of law. Although we are not bound by the hearing examiner's conclusions of law in the same manner as by its factual findings, we may nonetheless defer to the hearing examiner's legal conclusion. *West Bend Educ. Ass'n v. WERC*, 121 Wis. 2d 1, 11–12, 357 N.W.2d 534 (1984). We generally apply three levels of deference to conclusions of law and statutory interpretation in agency decisions. *Jicha v. DILHR*, 169 Wis. 2d 284, 290, 485 N.W.2d 256 (1992). First, if the administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and

application of the statute, the agency determination is entitled to "great weight." *Id.* at 290–91. The second level of review provides that if the agency decision is "very nearly" one of first impression, it is entitled to "due weight" or "great bearing." *Id.* at 291. The lowest level of review, the de novo standard, is applied where it is clear from the lack of agency precedent that the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented. *Id.*

## Analysis

¶ 23. After our independent review of the record, we hold that there is substantial evidence to support the hearing examiner's findings of fact. The hearing examiner determined, and we agree, that Kitten's evidence was less credible than Cenname's. Kitten insists that his reason for demanding that Cenname pay six months' rent in advance was due to economic circumstances. However, Kitten's actions during the course of the events belie his explanation. Kitten was aware of Cenname's financial situation at the time that the lease was completed. Kitten did not indicate at any time that he was concerned about the lack of financial information or the quality of the financial information. Moreover, when Cenname asked "where do we stand," Kitten informed him that the apartment was his.

¶ 24. Although Kitten claims that the credit check on Cenname showed an inadequate credit history, Kitten never raised this as an issue with Cenname. The only reason Kitten provided Cenname for needing an additional six months' advance rent was Kitten's fear that Cenname would have a relapse of his eating disorder and would require hospitalization. Kitten's fears and concerns about Cenname's eating disorder

were also shown by his desire to speak to Cenname's doctor. Kitten also demonstrated his concerns about Cenname's eating disorder in his questioning of Cenname and his mother as to whether Cenname might attempt to commit suicide while residing in the apartment.

¶ 25. While Kitten now attempts to characterize his actions as being concerned about Cenname's financial ability to pay, Kitten's actions do not support this characterization. Additionally, the hearing examiner noted that Kitten was extremely evasive and unwilling to provide direct answers to questions during his examination by Cenname's attorney. The record, including the hearing examiner's observations of credibility, leads us to determine that Kitten's reason for attempting to speak to Cenname's doctor and for requiring Cenname to pay an additional six months' advance rent was due to Cenname's eating disorder.

¶ 26. Kitten argues that even if he was concerned with Cenname's eating disorder, there can be no finding of discrimination because Cenname's condition does not rise to the level of a disability as described by law. In support of this argument, Kitten points to the hearing examiner's determination that Cenname failed to establish a legal disability. We defer to this finding, but agree with the hearing examiner that there is sufficient evidence to establish that Kitten regarded Cenname's eating disorder as being a physical or mental impairment that substantially limited Cenname's ability to enjoy major life functions. Specifically, Kitten showed by his actions and his statements that he believed that Cenname's eating disorder would cause him to be unable to take care of himself and live on his own. Kitten believed that Cenname might have a relapse of

677

his eating disorder symptoms when living alone and would require continuing hospitalization. Alternatively, Kitten hypothesized aloud to Cenname that Cenname's eating disorder could cause him to suffer from depression and lead to an attempt to commit suicide. Given Kitten's belief that Cenname's eating disorder would prevent him from being able to live on his own and take care of himself without further hospitalization or attempts on his life, we agree with the hearing examiner's determination that Kitten regarded Cenname as having a disability within the meaning of WOHA. Thus, substantial evidence supports the hearing examiner's finding that Kitten exacted different rental terms from Cenname because of a "disability" within the meaning of the WOHA and not because of financial considerations.

¶ 27. Kitten argues that we ought to apply a de novo standard of review to the hearing examiner's conclusions of law and statutory interpretation of the WOHA. Cenname believes that any one of the three levels of deference could arguably be applied because the issue could be characterized as one intertwined with value or policy determinations, or as one "very nearly" or "clearly" of first impression. The correct test under Wisconsin law is whether an agency has experience in interpreting a particular statutory scheme, not whether it has ruled on the precise, or even substantially similar, facts before. *Barron Elec. Coop. v. PSC*, 212 Wis. 2d 752, 764, 569 N.W.2d 726 (Ct. App. 1997). We conclude that under the *Barron* test, the proper standard of review to be given to DWD's legal determinations in this case is great weight deference. Here, the statutory scheme being interpreted by DWD is Wis. Stat. § 106.04. DWD and its predecessors have been charged with the duty of administering that statute.

Sec. 106.04(1s). Therefore, its interpretation of the statute will be given great weight in this case. However, even if we were to apply the de novo standard of review, we would reach the same result.

¶ 28. We have already held that there is substantial evidence to show that Kitten exacted different rental terms from Cenname because of a "disability" within the meaning of the WOHA. We now address the statutory interpretation and application issue of whether there was a "disability" within the meaning of the WOHA.

¶ 29. In *School Board of Nassau County v. Arline*, 480 U.S. 273, 284 (1987) (*superceded by statute on other grounds*), the United States Supreme Court approvingly observed that Congress has acknowledged that society's accumulated myths and fears about disability are as handicapping as are the physical limitations that flow from actual impairment. In *Arline*, a school teacher, who was fired from her job solely because of her susceptibility to tuberculosis, brought an action alleging that her dismissal violated § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. *Arline*, 480 U.S. at 275–76. The Supreme Court held that a school teacher afflicted with a contagious disease of tuberculosis was a handicapped individual within the meaning of the Rehabilitation Act, which prohibited a federally funded state program from discriminating against a handicapped individual solely by reason of handicap. *Id.* at 289. Significantly, the Supreme Court pointed out that Congress had amended the definition of a handicapped individual to include not only those who are actually physically impaired, but also those who are *regarded as* impaired and who, as a result, are substantially limited in a major life activity. *Id.* at 284.

679

¶ 30. We find the Supreme Court's analysis in *Arline* analogous and helpful here. The term "disability" in the WOHA is defined as "a physical or mental impairment that substantially limits one or more major life activities, a record of having such an impairment or *being regarded as having such an impairment.*" Wis. Stat. § 106.04(1m)(g) (emphasis added). Given the Supreme Court's *Arline* analysis of the similar federal statute, it is no great leap for us to interpret the WOHA as protecting a person who is "regarded" by a landlord as having an impairment that substantially limits major life activities even if, in fact, he or she does not have such an impairment.

¶ 31. In this case, the hearing examiner determined that Cenname failed to establish that his eating disorder was an actual "physical or mental impairment that substantially limits one or more major life activities," or that he had any "record" of such an impairment within the meaning of the WOHA. The examiner determined that there was sufficient evidence, however, to establish that Kitten "regarded" Cenname's eating disorder as being a physical or mental impairment that substantially limited his ability to enjoy major life functions. Specifically, the hearing examiner found that Kitten demonstrated by his actions and statements that he believed that Cenname's eating disorder might cause him to be unable to take care of himself and to live on his own. The hearing examiner relied upon Kitten's statements reflecting his belief that Cenname would have a relapse of his eating disorder symptoms when living alone and he would require further hospitalization. The hearing examiner also relied upon Kitten's statements reflecting his belief that Cenname's eating disorder was associated with depression and that Cen-

name might attempt to commit suicide. We hold that Kitten violated the WOHA by exacting a different or more stringent price, terms or conditions from Cenname for the rental of a housing unit because of a "disability" within the meaning of the WOHA.

¶ 32. Finally, Kitten argues that the award of damages and the out-of-pocket expenses award are not warranted. Primarily, Kitten's arguments go to his basic contention that he did not violate the WOHA by imposing different or more stringent rental terms and conditions on Cenname. Because we have rejected Kitten's contention that he did not discriminate against Cenname in violation of the WOHA, we need not address Kitten's arguments in this regard.

*By the Court.*—Order affirmed.