Donald R. KITTEN, Plaintiff-Appellant-Petitioner,†

v.

STATE of Wisconsin DEPARTMENT OF WORKFORCE DEVELOPMENT, Defendant-Respondent.

Supreme Court

*No. 00–3562. Oral argument February 4, 2002.—Decided May 24, 2002.*

2002 WI 54

(Also reported in 644 N.W.2d 649.)

† Motion for reconsideration denied 9-18-02.

For the plaintiff-appellant-petitioner there were briefs by *Phil Elliott, Jr.,* and *Elliott, Elliott & Staskunas,* West Allis, and oral argument by *Phil Elliott, Jr.*

For the defendant-respondent the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

An amicus curiae brief was filed by *Mary Dianne Greenley, Michael Bachhuber,* and *Monica Murphy,* Madison, on behalf of the Wisconsin Coalition for Advocacy, Inc.

¶ 1. JON P. WILCOX, J. In this case, we review a

court of appeals decision, *Kitten v. DWD*, 2001 WI App 218, 247 Wis. 2d 661, 634 N.W.2d 583, which affirmed the administrative ruling of Department of Workforce Development (DWD) hearing examiner Alice E. DeLaO. The hearing examiner concluded that Donald R. Kitten had violated the Wisconsin Open Housing Act (WOHA), Wis. Stat. § 106.04 (1997–98)[1], when he discriminated against the complainant, Spencer Cenname, on the basis of a perceived disability.

¶ 2.	Cenname sought to rent an apartment from Kitten. When Kitten found out that Cenname had previously been hospitalized for the eating disorder bulimia nervosa, Kitten became concerned that Cenname would either attempt suicide or be rehospitalized and therefore unable to pay the rent. As a result, Kitten sought an advance payment of six months' rent from Cenname.

¶ 3.	Cenname filed a complaint with the Equal Rights Division of the DWD claiming that Kitten had discriminated against him on the basis of disability. The hearing examiner determined that there was not enough evidence to conclude that Cenname had an *actual* disability under the WOHA, but that there was sufficient evidence to show that Kitten regarded Cenname's eating disorder as one that substantially limited Cenname's major life functions. The hearing examiner concluded that this qualified as a disability under the WOHA because of the "regarded as" clause in the statutory definition of "disability," Wis. Stat. § 106.04(1m)(g).

---

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated. The WOHA has since been renumbered as Wis. Stat. § 106.50 (1999–2000). *See* 1999 Wis. Act 82.

568

¶ 4. On judicial appeal, both the Waukesha County Circuit Court, Donald J. Hassin, Judge, and the court of appeals affirmed the conclusions of the hearing examiner. On review, we agree, and hold that Kitten's perception of Cenname's impairment was sufficient to qualify as a "disability" under the "regarded as" provision of the WOHA. We therefore affirm the court of appeals and uphold the decision of the hearing examiner.

I

¶ 5. We begin by recounting the facts of the case. Because this is a review of an administrative hearing, we will uphold the hearing examiner's findings of fact as long as they are supported by substantial evidence in the record. Wis. Stat. § 227.57(6). The test is whether, taking into account all of the evidence in the record, " 'reasonable minds could arrive at the same conclusion as the agency.' " *RURAL v. PSC*, 2000 WI 129, 239 Wis. 2d 660, 676, 619 N.W.2d 888 (quoting *Madison Gas & Elec. Co. v. PSC*, 109 Wis. 2d 127, 133, 325 N.W.2d 339 (1982)). The findings of an administrative agency do not even need to reflect a preponderance of the evidence as long as the agency's conclusions are reasonable. *Chi. & N.W.R.R. v. LIRC*, 98 Wis. 2d 592, 607–08, 297 N.W.2d 819 (1980). If the factual findings of the administrative body are reasonable, they will be upheld.

¶ 6. Although the parties do suggest that there are some factual disputes in this case, we think that the findings of the hearing examiner are reasonable and that they are supported by the evidence in the record. We therefore accept the following findings of fact, as made by the hearing examiner in this case.

569

¶ 7. On September 8, 1998, Cenname called Kitten to inquire about an apartment in Brookfield, which Kitten had advertised for rent. Kitten told Cenname that the apartment was expensive—$925 a month—and that Cenname "must have a pretty good job" to afford the rent. Cenname said he was not currently employed, but he could provide a financial statement showing he was able to pay the rent. Kitten noticed on his telephone caller identification device that Cenname's phone call had originated at the Rogers Memorial Hospital.[2]

¶ 8. Cenname met with Kitten the next day, viewed the rental property, and decided that he wanted to lease it. Cenname provided Kitten with a letter from his father detailing Cenname's financial status. Cenname's father was an executive with Merrill Lynch, who also served as Cenname's financial advisor. The letter showed Cenname's current account balances as in excess of $40,000 and noted that Cenname received an income of $3000 per month after taxes. The letter further stated that Cenname had maintained an account with Merrill Lynch for over 13 years, and that Cenname's credit card bills had always been paid promptly. Along with the letter, Cenname gave Kitten copies of his account statements, confirming that he had a balance of over $40,000 as of July 31, 1998. Cenname also provided the names and telephone numbers of several financial references, including a former landlord.

¶ 9. As they prepared the paperwork, Kitten asked Cenname where he lived. Cenname initially said that he was staying with friends. Kitten persisted in his

___

[2] Rogers Memorial Hospital is a specialized healthcare facility that provides inpatient and outpatient treatment for persons with certain behavioral disorders and mental illnesses. *See* http://www.rogersmemorial.org.

questioning, however, and Cenname eventually admitted that he was living at Rogers Memorial Hospital, where he was in residential treatment for an eating disorder. Kitten and Cenname had a short discussion about the eating disorder, and Kitten mentioned that it looked like Cenname had not been eating enough.

¶ 10. Kitten reviewed the lease agreement with Cenname and pointed out that Cenname would be required to pay one month's rent in advance along with a $1000 security deposit. Kitten explained that any money paid on that day would be non-refundable in the event that Cenname decided not to lease the apartment. Kitten also went over several other provisions of the lease, including the fact that Kitten intended to run a credit check on Cenname before Kitten would sign the lease. When they finished reviewing the lease, Cenname wrote a check to Kitten for $1925 to cover the first month's rent and the security deposit. Cenname asked Kitten for a copy of the lease, and Kitten told Cenname that he would send a copy by mail.

¶ 11. On September 11, 1998, Kitten received a verbal credit report for Cenname. The report revealed that Cenname's credit history was sparse, but it did not show any negative information. The verbal report was confirmed by a written credit report, which Kitten received about three weeks later. Kitten cashed Cenname's check on September 14, 1998.

¶ 12. On September 27, 1998, Cenname called to inform Kitten that he intended to move into the apartment on October 2, 1998. Cenname asked Kitten how he would get into the apartment and asked why Kitten had not sent him a copy of the lease. Kitten said that he was concerned that Cenname might be readmitted to the hospital and that Kitten would not get his rent money. Kitten said he would "feel better" if Cenname

paid six months' rent in advance. Cenname initially agreed to pay Kitten the advance rent because he was afraid that Kitten would not rent the apartment to him otherwise. Cenname agreed to meet Kitten at the apartment on October 2 and asked Kitten to fax a copy of the lease to the hospital.

¶ 13. Kitten called Cenname the next day and asked if he could talk to Cenname's doctor. Cenname told Kitten that his treating physician was Dr. Richard Holbrook, the director of the Eating Disorder Center at Rogers Memorial Hospital. Cenname said that he would have Dr. Holbrook call Kitten. Cenname again mentioned that he was uncomfortable paying the advance rent; Kitten responded by reiterating his concern about rehospitalization. Cenname renewed his request for a copy of the lease.

¶ 14. On September 29, 1998, Kitten called Dr. Holbrook's office and left a message asking to speak with Dr. Holbrook about Cenname. Deanna Mueller, the clinic's office manager, got the message and contacted Cenname to see if Cenname would give Dr. Holbrook permission to speak with Kitten. Cenname was surprised to hear that Kitten had attempted to contact Dr. Holbrook without Cenname's approval and refused to give his consent.

¶ 15. Cenname called Kitten and expressed his displeasure with Kitten's actions. Kitten insisted that he needed to speak with Cenname's doctor and again insisted on a payment of six months' rent up front. Later that day, Kitten finally faxed a copy of the lease to Cenname. The copy of the lease bore only Cenname's signature; Kitten had not signed it.

¶ 16. On September 30, 1998, Cenname contacted Kitten to say that he would not pay the six months' advance rent and that Kitten did not have permission to

speak to Dr. Holbrook. Kitten said that his sister, a nurse, had told him that Cenname's condition could involve depression. Kitten then described a hypothetical situation where he came to the apartment and found Cenname in his car, in the garage, with the door closed, and exhaust fumes coming from the car. Kitten said he was concerned that such a situation would damage the rental unit. Cenname denied being suicidal, and said that if Kitten needed more financial information, he should call Cenname's father.

¶ 17. Later that day, Kitten called Cenname's parents' home in Columbus, Ohio, and spoke with Cenname's mother. Cenname's father was not home at the time. Kitten explained that he had two concerns about Cenname renting the apartment. First, Kitten stated that he was worried that Cenname might try to commit suicide. Kitten explained that the garages were attached to the housing units and he was worried that exhaust fumes might enter the other units. Cenname's mother told Kitten that Cenname had been suicidal at one time, but that it was not a present concern. Kitten also asked Cenname's mother if she and her husband were willing to co-sign Cenname's lease and be jointly responsible for the rental payments. Cenname's mother assured Kitten that Cenname had a guaranteed income of $36,000 a year, but agreed to co-sign the lease as long as Kitten informed Cenname that Kitten was asking them to co-sign.

¶ 18. Kitten spoke with Cenname that day and told Cenname that he had spoken to Cenname's mother. Kitten indicated that Cenname's mother had said Cenname should "choose his poison"—suggesting that Cenname had to choose either to pay the six months'

advance rent or to have his parents co-sign the lease. Cenname's mother denied having made such a statement.

¶ 19. Cenname discussed the matter with a local fair housing organization, which encouraged Cenname to pretend to agree to the advance rent payment and tape record his conversation with Kitten. After talking with a family attorney from Ohio and the treatment staff at the hospital, however, Cenname decided *not to* go through with the plan and tentatively decided to pay the advance rent.

¶ 20. On October 1, 1998, Cenname changed his mind again, and refused *to* make the advance payment. Cenname told Kitten that he planned to stick by the original agreement. Both parties then agreed that "the deal was off." Cenname asked for his $1925 down payment back, which Kitten refused to return. Kitten told Cenname that he did not intend to return the money because Cenname had already signed the lease.

¶ 21. Cenname filed a complaint with the DWD Equal Rights Division alleging that Kitten had violated the WOHA by exacting more stringent lease terms on account of Cenname's disability. An investigator found probable cause for the complaint and the matter was brought before a hearing examiner on the merits of the claim.

¶ 22. After a full hearing, the hearing examiner found that there was insufficient evidence to show that Cenname had an actual disability or a record of disability.[3] However, the examiner held that Cenname was a person with a disability within the meaning of the WOHA because Kitten *regarded* Cenname as disabled.

---

[3] This was primarily due to the fact that Dr. Holbrook did not testify at the hearing.

The hearing examiner also concluded that Kitten had violated the WOHA by exacting more stringent terms for the rental of a housing unit because of the perceived disability.

¶ 23. Kitten was ordered to pay $12,673.67 for expenses incurred by Cenname as a result of the discriminatory actions, an amount which included the return of Cenname's security deposit. Kitten was also ordered to pay $10,000 for Cenname's emotional distress and $5000 as a forfeiture to the State. Kitten sought judicial review of the decision under Wis. Stat. §§ 106.04(6)(j) and 227.52.

¶ 24. Both the Waukesha County Circuit Court and the court of appeals affirmed the hearing examiner's decision. In a published opinion, the court of appeals agreed with the hearing examiner's finding that Kitten's beliefs about Cenname's eating disorder qualified as a disability under the WOHA because of the "regarded as" clause of § 106.04(1m)(g). *Kitten,* 2001 WI App 218, ¶ 30. The court of appeals also held that there was enough evidence for the hearing examiner to conclude that Kitten believed that Cenname's condition substantially impaired Cenname's ability to perform major life functions. *Id.* at ¶ 31.

¶ 25. This court accepted Kitten's petition for review and we affirm the court of appeals' decision. We hold that the hearing examiner correctly decided that Kitten's perceptions of Cenname qualified as a disability under the WOHA and that Kitten discriminated against Cenname on the basis of that perceived disability.

## II

■

¶ 26. As with most cases involving the review of administrative decisions, we begin with a brief discussion of the standard of review. Although we owe substantial deference to an administrative agency's findings of fact, the deference we owe to an agency's legal conclusions depends on several factors.

■

¶ 27. When analyzing agency decisions, this court has generally applied three levels of deference to an agency's conclusions of law and statutory interpretation. *Jicha v. DILHR*, 169 Wis. 2d 284, 290, 485 N.W.2d 256 (1992). If the agency is charged by the legislature with the interpretation of a statute; the interpretation of the agency is long-standing; and the agency has experience, technical competence, and specialized knowledge that aid the agency in its interpretation and application of the statute, we have afforded the agency determination great weight. *Id.* at 290–91; *Theuer v. LIRC*, 2001 WI 26, ¶ 6, 242 Wis. 2d 29, 624 N.W.2d 110. Under the "great weight" standard, we will uphold the agency's decision unless it is unreasonable. *Theuer*, 2001 WI 26, ¶ 14.

■

¶ 28. If the issue is " 'very nearly' one of first impression," we give due weight to the agency's determinations. *Jicha*, 169 Wis. 2d at 291. Under the "due weight" standard, we give the agency's decision some deference if the agency's interpretation is reasonable and complies with the statute's purpose; however, we are not bound by the decision. *Brauneis v. State*, 2000 WI 69, ¶ 20, 236 Wis. 2d 27, 612 N.W.2d 635. If an

alternative interpretation appears more reasonable, we are not required to adopt the agency's interpretation. *Id.*

■

¶ 29. Finally, when the issue is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented, we review the agency's interpretation de novo. *Id.*

¶ 30. In this case, we are presented with three questions of law. First, we must decide whether discrimination based on a perceived disability is sufficient to trigger the protections of the WOHA even when the complainant has not proven an actual disability. Second, if we answer the first question affirmatively, we must decide if the perceived impairment in this case rises to the level of a disability for the purposes of the statute. Finally, if a disability does exist under the statute, we must then determine if Kitten discriminated against Cenname on the basis of that disability.

■

¶ 31. In weighing the standards of review, we think that it is appropriate to consider all three questions under the "great weight" standard. The legislature has given the DWD Equal Rights Division and its predecessors the responsibility for administering the WOHA. Wis. Stat. § 106.04(1s). As such, the Equal Rights Division has experience in deciding cases of discrimination based on disability and is regularly required to determine both if an individual's impairment rises to the level of a "disability" under the statute and whether a party's actions constitute discrimination. We therefore find the "great weight" standard of review appropriate.

## A

¶ 32. We first address the question of if and when housing discrimination based on a perceived disability is actionable under the WOHA. In her decision, the hearing examiner found that there was not enough evidence to prove that Cenname had either an actual disability or a record of disability. Both parties agree with this conclusion and, after a review of the record, so do we. The debate arises in this case because of the examiner's other conclusion—that the record showed sufficient evidence that Kitten "regarded" Cenname as disabled. We thus focus our attention on whether the hearing examiner correctly decided that such a "perceived" disability could trigger the protections of the WOHA.

¶ 33. This is a question of statutory interpretation. As with all questions of statutory interpretation, our goal is to discern the intent of the legislature. *Landis v. Physicians Ins. Co.,* 2001 WI 86, ¶ 14, 245 Wis.2d 1, 628 N.W.2d 893. To determine legislative intent, we first look to the plain language of the statute. *Id.* If the legislature's intent can be determined from the clear and unambiguous language of the statute, we do not look beyond the statutory language to ascertain its meaning. *Id.*

¶ 34. For purposes of the WOHA, "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities, a record of having such an impairment or being regarded as having such an impairment. . . . " Wis. Stat. § 106.04(1m)(g). The first two parts of this definition plainly require some proof of an actual or former impairment. The question presented here involves the

third part of that definition: whether the "regarded as" clause protects persons against discrimination based on a perceived disability when the complainant cannot or does not prove the existence of an actual disability. We focus on the construction of that clause.

¶ 35. Because the "regarded as" clause refers back to the portion of the definition that describes the requirements for an actual disability, we must adopt that reference as included in the "regarded as" definition. Thus, to be "regarded as" disabled, a person must be "regarded as having a physical or mental impairment that substantially limits one or more major life activities." "Regard" is not statutorily defined. However, the word's common definition, as used here, is "to look at from a particular point of view." *Webster's Third New International Dictionary* 1911 (1986); *see also* Wis. Stat. § 990.01(1). Thus, we think the plain language of the "regarded as" clause supports the notion that some form of perceived disability qualifies as a disability under the WOHA.

¶ 36. It is not clear, however, whether the impairment itself must be an *actual* impairment or whether the impairment, as well as the extent of that impairment, may be merely perceived. Depending on whether or not the phrase "regarded as" modifies the term "impairment," as well as the phrase "substantially limits one or more major life activities," the complainant's quantum of proof can vary. For instance, a person might be "regarded as" disabled when that person has an actual impairment, which is mistakenly viewed as a substantially limiting condition when in reality it is not. *See* Michael D. Moberly, *Perception or Reality?: Some Reflections on the Interpretation of Disability Discrimination Statutes,* 13 Hofstra Lab. & Emp. L.J. 345, 347

n.23 (1996) (citing *Bogue v. Better-Bilt Aluminum Co.,* 875 P.2d 1327, 1335 (Ariz. Ct. App. 1994)). Alternatively, a person might be "regarded as" disabled if that person has an actual impairment that does not itself limit his or her activities, but does limit the person's activities because of the attitudes and perceptions of others. *Id.* A person might also be "regarded as" disabled if the person has no actual impairment whatsoever, but another person mistakenly believes that impairment exists, and mistakenly believes that the impairment substantially limits that individual's major life activities. *Id.*

¶ 37. Kitten argues that there can be no finding of a disability when the complainant does not prove the existence of some impairment that would qualify as a disability under the WOHA. Kitten notes that there was no expert medical testimony given at the administrative hearing and the only medical evidence admitted was a letter from Dr. Holbrook stating that Cenname had been diagnosed with bulimia nervosa[4] and that

---

[4] Kitten asserted, both in his brief and at oral argument, that he was unable to find a medical definition for "bulimia nervosa," suggesting that this supported his argument that Cenname had not proven the existence of a disability. We note that we were able to find definitions in at least two leading medical references with little trouble. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* § 307.51, at 589–94 (4th ed., text rev., 2000) (listing "bulimia nervosa" as an eating disorder characterized by recurrent episodes of binge eating and recurrent inappropriate compensatory behavior to prevent weight gain such as self-induced vomiting; misuse of laxatives, diuretics, enemas, or other medications; fasting; or excessive exercise); *Stedman's Medical Dictionary* 218 (25th ed. 1990) (defining "bulimia nervosa" as a "chronic morbid disorder involving repeated and secretive episodic bouts of eating characterized by uncontrolled

Cenname was under Dr. Holbrook's care for that disorder. As such, Kitten argues that Cenname was unable to show that he had a physical or mental impairment that substantially limited one or more of his major life activities, as defined by Wis. Stat. § 106.04(1m). Kitten emphasizes the hearing examiner's explicit acknowledgement that there was not enough evidence to show that Cenname had an actual disability or a record of disability.

¶ 38. We agree with Kitten's assessment of the evidence only as far as it applies to proof of an actual disability or a record of disability under the statutory definition. Here, however, the examiner held that Kitten's perceptions and beliefs about Cenname's depression, suicidal tendencies, and the chance of Cenname being rehospitalized, even if incorrect, could qualify as a disability under the third part of the definition—the "regarded as" clause. Wis. Stat. § 106.04(1m)(g). Kitten's argument misses what we think is a more important inquiry here, which relates to Cenname's proof of an actual impairment, and not his proof of disability.

¶ 39. There is no statutory definition of "impairment" in the WOHA. However, we have previously defined "impairment" in the context of the WFEA to mean a "lessening, deterioration, or damage to a normal bodily function or bodily condition." *La Crosse Police & Fire Comm. v. LIRC,* 139 Wis. 2d 740, 759–60, 407 N.W.2d 510 (1987); *Am. Motors Corp. v. LIRC,* 119 Wis. 2d 706, 713, 350 N.W.2d 120 (1984). Since it is used

rapid ingestion of large quantities of food over a short period of time, followed by self-induced vomiting, purging, and anorexia; accompanied by feelings of guilt, depression, or self-disgust").

581

similarly, we think that this definition is also appropriate for inquiries under the WOHA.

¶ 40. The problem arises in this case because there is some evidence that Cenname had an actual impairment, but the hearing examiner never made a ruling on that issue. The examiner only held that Cenname was unable to prove an actual *disability*. We agree that the examiner's conclusion with regard to the actual disability was reasonable, but we are still left with the question of whether the perception of an impairment is sufficient to trigger the protections of the WOHA.

¶ 41. To answer this question, we find it appropriate to draw comparisons to employment discrimination cases, as we have not addressed the issue as it relates to the WOHA. We focus on *La Crosse,* 139 Wis. 2d 740, where we faced a question nearly identical to the one presented here as it related to the definition of "handicapped individual" under the Wisconsin Fair Employment Act (WFEA). In *La Crosse,* the complainant, Daniel Rusch, applied for employment with the city of La Crosse as a police officer. The La Crosse Police and Fire Commission (PFC) recommended to the police chief that Rusch not be hired because of his substandard performance on a back-strength test during a physical examination. *Id.* at 746. After consulting with a physical therapist, Rusch retook and passed the back-strength test, but was still not placed on the police eligibility list because he had failed the first test. *Id.* at 747. Rusch filed a complaint with the Wisconsin Department of Industry, Labor and Human Rights (DILHR), arguing that he had been discriminated against on the basis of a perceived handicap.

¶ 42. The PFC argued that Rusch could not be considered a "handicapped individual" under the WFEA

if he did not prove some actual impairment that rose to the level required under the statute. On review, we disagreed, holding that the perception of a handicap was enough to invoke the statute. *Id.* at 765.

¶ 43. Although we did not base our holding on it, we took particular note of the fact that between the time Rusch filed his complaint and the time the decision was issued in *La Crosse,* the legislature had added a definition of "handicapped individual" to the statute. *See* ch. 334, Laws of 1981. Under the new definition, a "handicapped individual" within the meaning of the WFEA was a person who "(a) Has a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work; (b) Has a record of such an impairment; or (c) *Is perceived as having such an impairment.*" Wis. Stat. § 111.32(8) (1983–84) (emphasis added).[5] Although the statute was not in effect in time for us to use it in the *La Crosse* case, we noted that the history of the statute demonstrated the legislature's intent to codify definitions that had already been adopted in prior cases of this court. *La Crosse,* 139 Wis. 2d at 756; *Am. Motors,* 119 Wis. 2d at 712 n.4.

¶ 44. Turning back to the WOHA, we see that it contains language very similar to that of the WFEA definition referenced in *La Crosse.* As we pointed out previously, a "disability" is defined under the WOHA as a "physical or mental impairment that substantially limits one or more major life activities, a record of having such an impairment or being regarded as having such an impairment. . . ." Wis. Stat. § 106.04(1m)(g) (emphasis added). Although the three parts of the

---

[5] The current version of the WFEA has changed the term "handicap" to "disability" but is otherwise identical to the statute passed in 1982. Wis. Stat. § 111.32(8) (1999–2000).

WOHA definition are not separately enumerated as they are in the WFEA, the definitions still mirror each other. Most notably, the last part of the WOHA definition, the "regarded as" clause, serves a similar purpose as the "perceived" clause in the WFEA. In *La Crosse,* we held that the complainant does not have the burden of demonstrating the existence of an actual disability if a perceived disability can be proven. *La Crosse,* 139 Wis. 2d at 765. We think that similar reasoning applies to the WOHA.

¶ 45. In *La Crosse,* we held that to establish a "handicap" under the WFEA, the employee must show that (1) there is "a real or perceived impairment," and (2) the impairment is "such that it either actually makes or is perceived as making achievement unusually difficult or limits the capacity to work." *La Crosse,* 139 Wis. 2d at 760–61. If the two questions are answered in the affirmative, the complainant could be considered "handicapped" within the meaning of the statute.

■■■■■■

¶ 46. Using the parallel language of Wis. Stat. § 106.04(1m)(g), we think a similar test is appropriate to determine if a "disability" meets the WOHA definition. To establish a disability within the meaning of the statute, the complainant must show (1) that he or she has an actual impairment, a record of impairment, or is regarded as having an impairment; and (2) the impairment, whether real or perceived, is one that substantially limits one or more major life activities, or is regarded by the respondent to substantially limit one or more major life activities. If the complainant is able to prove both of these elements, the complainant will have demonstrated a disability under the WOHA. This also answers our original question: a perceived impairment may be sufficient to invoke the WOHA.

¶ 47. We recognize that, at first glance, this test seems to create an inconsistency. A person who is perceived as disabled, even if that person does not have any actual impairment, may be protected under the statute, while a person who has an actual impairment that does not rise to the level of a "disability" might not be protected. However, we cannot say that this interpretation is at odds with the intent of the WOHA.

¶ 48. As articulated by the legislature, the purpose of the WOHA is:

> to render unlawful discrimination in housing. It is the declared policy of this state that all persons shall have an equal opportunity for housing regardless of sex, race, color, sexual orientation, disability, religion, national origin, marital status, family status, lawful source of income, age or ancestry . . . . [The WOHA] shall be deemed an exercise of the police powers of the state for the protection of the welfare, health, peace, dignity and human rights of the people of this state.

Wis. Stat. § 106.04(1). The multi-part definition of "disability" satisfies this purpose in two ways. By protecting persons with actual disabilities or a record of disability from discrimination, the WOHA guarantees those persons equal access to housing. However, by supplying consequences for those who discriminate based on perceived disabilities as well as actual disabilities, the statute also helps combat incorrect assumptions about people with disabilities that are held by the public.[6] In either situation, there is harm to the person who is

---

[6] At oral argument, concerns were raised about punishing housing discrimination where the discriminator incorrectly perceives that a normally benign condition significantly affects a person's major life activities. However, because the statute serves the dual purposes of protecting those who are actually

discriminated against. As the U.S. Supreme Court stated in *School Board of Nassau County v. Arline,* "[S]ociety's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Sch. Bd. of Nassau County v. Arline,* 480 U.S. 273, 284 (1987). By providing a penalty for those who discriminate based on perceived disabilities, the legislature has chosen to respond to such myths and fears in pursuit of the goal of open housing.

¶ 49. Because the hearing examiner's conclusions were reasonable and kept with the intent of the statute, we hold that the hearing examiner correctly concluded that a perceived disability can qualify as a disability under the WOHA, even when no actual disability has been proven.

## B

¶ 50. Having decided that a perceived disability falls within the WOHA's definition of "disability," we next turn to the question of whether the disability perceived by Kitten in this case rises to the level necessary to be covered by the statute. As we have already stated, in answering this question, we afford the decision of the hearing examiner great weight.

¶ 51. We begin by restating our test articulated above: To prove a disability under the WOHA, the complainant must show (1) that he or she has an actual impairment, a record of impairment, or is regarded as having an impairment; and (2) the impairment,

---

disabled and combating incorrect public perceptions of disability, we cannot say for certain that the legislature did not intend such a result. Still, we do not reach that question here, as the facts of this case do not fall into that category.

586

whether real or perceived, substantially limits one or more major life activities, or is regarded by the respondent to substantially limit one or more major life activities.

¶ 52. Applying the first part of our test to the facts of the present case, we think that there is little question that Kitten perceived that Cenname had an impairment. Even though the actual disability was unproven at the hearing, there was evidence that Kitten was aware that Cenname had been diagnosed with bulimia. As a result, Kitten thought that Cenname necessarily suffered from severe depression, that Cenname was likely suicidal, and that Cenname was likely to return to the hospital for residential treatment. Kitten certainly perceived that Cenname had a lessening of normal bodily function.

¶ 53. Finding the first element met, we move to the second part of our test, and determine if the impairment perceived by Kitten was one that Kitten regarded as substantially limiting one or more of Cenname's major life activities. Under this part of the test, because we are assessing Kitten's perception of the disability, we must look at the subjective beliefs of the respondent and, taking them as true, determine if they would meet the objective standard for an actual disability. That is, if Kitten's perceptions about Cenname's impairment were true, we must determine if one or more of Cenname's major life activities would be limited. If the answer is yes, the second part of our test is met, and the perceived impairment is sufficient to qualify as a disability under the statute.

¶ 54. In this analysis, we are strongly persuaded by the U.S. Supreme Court's discussion of disability in

its recent holding in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002). In *Toyota*, the Court addressed the meaning of the term "disability" under the Americans with Disabilities Act (ADA) of 1990, whose definition of the term is virtually identical to that in the WOHA.[7] Writing for a unanimous Court, Justice O'Connor defined "major life activities" as "those activities that are of central importance to daily life . . . includ[ing] such basic abilities as walking, seeing, and hearing." *Toyota,* 534 U.S. at 197. To be "substantially limited" in those activities, the individual must have a permanent or long-term impairment that prevents or severely restricts the individual from performing them. *Id.* at 198.

¶ 55. Adopting this definition, we conclude that Kitten's perceptions did rise to the level where, if taken as true, Cenname's major life activities would have been limited. Kitten thought that Cenname's eating disorder would impair Cenname's ability to function to the point where he would not be able to live on his own. Kitten's perception was that Cenname would become severely depressed to the point of being suicidal, a situation that would undoubtedly limit Cenname's ability to perform day-to-day activities. Alternatively, Kitten thought that Cenname would have to be readmitted to inpatient residential treatment because he would not be able to carry out even basic daily tasks without assistance.

---

[7] The ADA definition states, "The term 'disability' means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (1994).

¶ 56. We give particular weight to Kitten's perception that Cenname might be rehospitalized. A patient in a residential, inpatient program, as opposed to an outpatient program, suggests that the person may be affected by a disorder to the point where he or she is substantially unable to function in daily life. *See, e.g.,* Residential Eating Disorder Program, *at* http://www.rogersmemorial.org/Eating/eating.htm (last visited May 21, 2002).

¶ 57. In sum, we must agree with the hearing examiner that Kitten's perceptions of Cenname show that Kitten regarded Cenname as disabled. Consequently, applying the definition of "disability," we also agree with the examiner's conclusion that Cenname proved that he was "disabled" within the meaning of the WOHA.

## C

¶ 58. Finally, because we hold that a disability was proven in this case, we must determine whether Kitten discriminated on the basis of this perceived disability. Again, we give great weight to the hearing examiner's reasoning and decision on this issue.

¶ 59. Under the WOHA, no one may "[s]egregate, separate, exclude or treat unequally a person in the terms, conditions or privileges of sale or rental of housing . . . because of a disability . . . ." Wis. Stat. § 106.04(2r)(b)2. We have already established the existence of a disability under the statute, so the question that remains is whether Kitten treated Cenname unequally in the terms, conditions, or privileges of the rental of housing on account of the perceived disability.

¶ 60. We think that there is more than sufficient evidence in the record for the hearing examiner to have found that Kitten discriminated based on the perceived disability in this case. Kitten sought six months' advance rent from Cenname, as opposed to the normal one month's rent and a security deposit. By Kitten's own admission, seeking advance rent was not a standard practice. It is easy to conclude that Kitten exacted unequal lease terms from Cenname.

¶ 61. Still, Kitten insists that he had a legitimate reason to ask Cenname for the advance rent. Specifically, he asserts that he was wary of Cenname's sparse credit history, as well as Cenname's current unemployment. Kitten insists that his motives were economic, rather than based on the perceived disability.[8]

¶ 62. Although we understand how these factors might have legitimately worried Kitten about renting to Cenname, we agree with the hearing examiner that the evidence still indicates that Kitten was primarily motivated by his perception of Cenname's disability rather than the economic factors. There is nothing in the record to show that Kitten brought his concerns about the credit report to Cenname's attention, and the only other significant change between Kitten's original terms and the higher terms was his perception of Cenname's condition. Kitten persisted in asking for the six months' advance rent despite a letter from Cenname's father

---

[8] We note that Kitten also never asserted the defense outlined in § 106.04(5m)(d), which states in part:

Nothing in this section requires that housing be made available to an individual whose tenancy would constitute a direct threat to the safety of other tenants . . . if the risk of direct threat . . . cannot be eliminated or sufficiently reduced through reasonable accommodations.

attesting to Cenname's ability to pay, copies of Cenname's bank records, and a list of Cenname's financial references.

¶ 63. Kitten's perceptions led him first to contact his sister, a nurse, to ask about Cenname's eating disorder. Based on the information from his sister, Kitten then attempted to contact Cenname's doctor and Cenname's parents. Kitten even asked Cenname's own mother if Cenname was suicidal. Throughout his dealings with Cenname, Kitten repeatedly expressed concerns about the possibility of Cenname relapsing, being rehospitalized, or attempting suicide. The hearing examiner's conclusion that Kitten discriminated on the basis of disability was more than reasonable given the facts of this case, and we thus uphold the examiner's decision in that regard.

## III

¶ 64. In conclusion, we hold that a perceived disability is sufficient to qualify as a "disability" under the WOHA. In this case, the hearing examiner correctly decided that Kitten perceived a disability, that the perceived disability rose to the level required under the statutory definition, and that Kitten proceeded to discriminate against Cenname based on that perceived disability by exacting more stringent lease terms from him. We therefore uphold the conclusions of the hearing examiner and affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.