COURT OF APPEALS
DECISION
DATED AND FILED

May 22, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP997**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV525

IN COURT OF APPEALS
DISTRICT II

---

SIERRA CLUB,

    PETITIONER-APPELLANT,

  V.

PUBLIC SERVICE COMMISSION OF WISCONSIN,

    RESPONDENT-RESPONDENT,

WISCONSIN ELECTRIC POWER COMPANY AND WISCONSIN GAS LLC,

    INTERVENORS-RESPONDENTS.

---

       APPEAL from an order of the circuit court for Dane County: RYAN D. NILSESTUEN, Judge. *Affirmed*.

       Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Sierra Club appeals a circuit court order affirming the Public Service Commission of Wisconsin's ("Commission") issue of a certificate of authority that authorized Wisconsin Electric Power Company and Wisconsin Gas LLC (collectively, "Utilities") to build and operate two liquefied natural gas ("LNG") peaking facilities.   On appeal, Sierra argues the Commission's final decision is unlawful because it was made by commission staff as opposed to the commissioners.   It contends there are errors in the forecasted load projections and the capacity gaps the Commission relied on to determine the facilities were needed.   Sierra argues the five-percent reserve margin applied by the Commission was an unpromulgated rule.   Finally, Sierra argues that the Commission improperly shifted the burden of proof on compliance with the Energy Priorities Law to Sierra as opposed to the Utilities.   We reject Sierra's arguments and affirm.

# BACKGROUND[1]

¶2     On July 2, 2020, the Utilities submitted an application for a certificate of authority that would authorize them to build two LNG peaking facilities.[2]  *See* WIS. STAT. § 196.49; WIS. ADMIN. CODE ch. PSC 133 (Jan. 2017). The Utilities proposed the project in order to meet consumers' peak demand needs

---

[1] WISCONSIN STAT. RULE 809.19(1)(d) (2021-22) requires parties to include record citations in their briefs.  Here, the Commission filed an index in the circuit court that was transmitted to this court as part of the record.  The index contains almost two hundred hyperlinks to documents on the Commission's website.  The Commission's brief does not contain citations to the record that it separately filed pursuant to its statutory obligation under WIS. STAT. § 227.55(1).  Instead, the Commission cites to this index and expects this court to follow the hyperlinks to its website in order to review the documents.  This is not acceptable.  In future cases, the Commission must provide record citations to the documents that are physically part of the court's record.

Related, we also emphasize that on a petition for review, the Commission has a statutory obligation under WIS. STAT. § 227.55(1) to "transmit to the reviewing court the original or a certified copy of the entire record, including all pleadings, notices, testimony, exhibits, findings, decisions, orders, and exceptions, except that by stipulation of all parties to the review proceedings the record may be shortened by eliminating any portion of the record."  Although the Commission electronically filed what purports to be a copy of the entire record, Sierra and the circuit court both observed that not all documents were physically included in the transmitted record.  Because the Commission did not cite to the documents it electronically filed, but it instead directed this court to hyperlinks, it appears the Commission is unaware of what it included in the record.  As the circuit court noted when discussing its own challenges in finding a document in this record, "websites can be easily changed, thus posing a challenge for an appellate court upon review."  The Commission is advised that in the future it must fulfill its statutory obligation and transmit either the entire record or whatever portion of the record the parties' stipulate to being transmitted.  *See id.*

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Throughout this decision, we take judicial notice of, and rely in part on, documents in the proceeding before the Commission.  *See* WIS. STAT. § 902.01 (governing judicial notice of adjudicative facts); ***Town of Holland v. PSC***, 2018 WI App 38, ¶30 n.9, 382 Wis. 2d 799, 913 N.W.2d 914 ("the court may take judicial notice of the files of the [Commission]").  As one example, the Utilities' application is not included in the record before us.  The Commission provides only a hyperlink to the application on its website.  Sierra notes the Utilities' application is not included in the record and provides us with an excerpted copy in its appendix.  Because there appears to be no dispute regarding the application, we will rely on the hyperlink.

in southeastern Wisconsin. The application explained that the facilities would store natural gas in liquefied form in order to provide a ready supply of natural gas to their distribution system during peak demand periods, which normally occur on the coldest days of winter. According to the Utilities, there was a projected capacity deficiency and no capacity in the interstate pipelines that currently supply natural gas to southeastern Wisconsin to cover projected loads. The Utilities considered expanding existing pipelines and contracting for additional capacity; however, they believed the proposed facilities would meet consumer peak demand needs at a much lower cost. The total cost of the project was estimated to be $409 million.

¶3  The Commission conducted a class 1 contested case proceeding on the Utilities' application. *See* WIS. STAT. § 227.01(3)(a). Sierra intervened as a party. As a class 1 contested case proceeding, the factual record was developed by the parties, commission staff, and an administrative law judge. *See* WIS. STAT. § 227.46(3)(b); WIS. ADMIN. CODE § PSC 2.04(2)(c) (Apr. 2007). The parties and commission staff filed written direct testimony, rebuttal testimony, surrebuttal testimony, sur-surrebuttal testimony, and exhibits. At a party hearing session, the parties cross-examined certain witnesses. In total, the parties and commission staff offered testimony from fifteen witnesses who in turn sponsored almost eighty exhibits. There was also a public hearing session and written public comments.

¶4  Following the hearings, the Utilities and Sierra each submitted initial and reply briefs. From all these materials, commission staff created a draft decision matrix and provided it to the parties. The draft decision matrix included a summary of the issues, staff positions (if any), and factual record citations for party arguments and positions. The parties then included their own position on each issue along with their own factual record citations. The final decision matrix

4

was thirty-seven pages and it was provided to the commissioners to guide their discussion of the Utilities' application at the open meeting.

¶5     On November 4, 2021, the commissioners discussed the Utilities' application at an open meeting. Based on the record, the commissioners made numerous determinations and ultimately authorized granting a certificate of authority to the Utilities with various conditions. As set forth in the meeting minutes, the commissioners directed commission staff "to draft an order consistent with its discussion."[3]

¶6     On December 21, 2021, the Commission's chief legal counsel circulated a draft of the final decision to the commissioners. This draft included the written concurrence and dissent of Commissioner Tyler Huebner. The next day, on December 22, the Secretary to the Commission signed and issued the final decision pursuant to the authority delegated to her by the Commission. The final decision was forty-three pages and included factual and legal determinations.

¶7     Sierra petitioned for judicial review and, ultimately, the circuit court entered an order that affirmed the Final Decision. Sierra appeals. Additional facts will be included below.

## DISCUSSION

¶8     On appeal, Sierra raises numerous challenges to the Commission's final decision. Sierra argues the final decision is unlawful because it was made by

---

[3] Sierra acknowledges this statement is in the minutes, but it points out that the statement is not in the transcript of the commissioners' actual motion and vote. Sierra fails to develop any argument as to why this would matter. *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

commission staff as opposed to the commissioners. It contends there are errors in the forecasted load projections and the capacity gaps the Commission relied on to determine the facilities were needed. Sierra argues the five-percent reserve margin applied by the Commission was an unpromulgated rule. It also asserts that the Commission improperly shifted the burden of proof on compliance with the Energy Priorities Law to it as opposed to the Utilities.

¶9    On appeal, we review the Commission's decision, not the decision of the circuit court. *Lamar Cent. Outdoor, LLC v. Div. of Hearings & Appeals*, 2019 WI 109, ¶9, 389 Wis. 2d 486, 936 N.W.2d 573. In performing that review, we do "not substitute [our] judgment for that of the agency as to the weight of the evidence on any disputed finding of fact," but we do not rely on "any finding of fact that is not supported by substantial evidence in the record." WIS. STAT. § 227.57(6). We also "accord no deference to the agency's interpretation of law." Sec. 227.57(11); *see also* *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21. However, "due weight shall be accorded [to] the experience, technical competence, and specialized knowledge of the agency involved." Sec. 227.57(10); *see also* *Tetra Tech*, 382 Wis. 2d 496, ¶78 ("'Due weight' is a matter of persuasion, not deference.").

## I.    Final decision

¶10    Sierra first argues the Commission's final decision is unlawful because it was made by commission staff as opposed to the commissioners. It asserts that at the open meeting, the commissioners only approved the thirteen conclusions from the decision matrix and "made no finding of fact on which those conclusions were purportedly based." It argues that the staff-created final decision is unlawful because it impermissibly deferred critical parts of the decision-making

process to staff, did not include the commissioners' own reasoning for determinations, and was created to "backfill" the commissioners' legal determinations. Sierra also asserts commission staff may have no part in drafting the final decision because some of them provided testimony and are therefore not impartial.

¶11 We reject Sierra's arguments. Nothing in the record supports Sierra's contention that the final decision in this case was made by the commission staff as opposed to the commissioners. The commissioners' discussion at the open meeting established the commissioners had reviewed the factual record and made reasoned, legal determinations based off that record. That the commissioners tasked staff with drafting the final decision "consistent with its discussion," does not mean that it was the staff as opposed to the commissioners who made the factual determinations. Sierra cites no legal authority prohibiting staff from drafting the commissioners' final decision. Indeed, commission staff have a prescribed role under WIS. ADMIN. CODE § PSC 2.03(1) (Apr. 2007), "appear[ing] neither in support of nor in opposition to any cause, but solely to discover and present, if necessary, information pertinent to the docket."

¶12 The record further establishes that once drafted, the final decision was circulated to the commissioners before release and contained one commissioner's concurrence and dissent. The commissioners have delegated the task of signing final decisions to the Secretary to the Commission, who signs on their behalf. The Secretary signed the final decision in this case. The Commission has maintained that the final decision in this case was that of the commissioners. Given the foundational presumption of honesty and integrity of administrative decision-makers, *County of Dane v. PSC*, 2022 WI 61, ¶56, 403 Wis. 2d 306, 976

N.W.2d 790, we conclude the record does not establish the final decision was made by commission staff as opposed to the commissioners.[4]

## II.     The Commission's finding of need

¶13    To approve the application to construct the two LNG facilities, the Commission had to determine, in part, that the proposed project would not "[p]rovide facilities unreasonably in excess of the probable future requirements." *See* WIS. STAT. § 196.49(3)(b)2.[5]  In their application, the Utilities asserted both facilities were needed because their existing peak gas capacity from pipelines and storage facilities was insufficient to meet their projected future peak demand "plus a 5% reserve margin."

---

[4] Sierra filed a notice of supplemental authority that consisted of the Commission's agenda and open meeting minutes from December 2023.  Sierra argues that because the Commission discussed a draft final decision at this open meeting, this demonstrates that the final decision in this case is that of the staff as opposed to the commissioners.  The Commission and the Utilities respond, in part, that the agenda and open meeting minutes are not supplemental authority.  We agree.  *See* WIS. STAT. RULE 809.19(10).  In any event, we considered Sierra's materials and they do not change our determination that the final decision in this case was that of the commissioners.

[5] The Commission also had to determine that the project did not:

> 1. Substantially impair the efficiency of the service of the public utility.
>
> ….
>
> 3. When placed in operation, add to the cost of service without proportionately increasing the value or available quantity of service unless the public utility waives consideration by the commission, in the fixation of rates, of such consequent increase of cost of service.

WIS. STAT. § 196.49(3)(b).

¶14 On appeal, Sierra challenges the Utilities modeling analysis of supply and demand and argues the Commission's "[f]inding of 'need' was arbitrary, lacked substantial evidence, and applied an unpromulgated policy." (Capitalization omitted.) Specifically, Sierra asserts the Utilities inflated the projected number of jobs that one large commercial and industrial ("C&I") customer would generate and therefore their demand projections were too high. Sierra argues that the Utilities' Oak Creek LNG facility should have been counted toward the Utilities' supply. Sierra also argues the five-percent reserve margin is an unpromulgated rule and the Commission erred by applying it to this case.

## A. Five-percent reserve margin

¶15 We start with Sierra's allegations that the Commission "erred … by applying an unpromulgated statement of general policy requiring an extra 5.0 percent 'margin' be added to projected maximum peak day demand." (Capitalization omitted.) To provide background to this argument, in the final decision, when discussing the need for the project, the Commission observed the Utilities' "methodology for forecasting need for the project was the same data and methodology used to develop their Gas Supply Plans for 2020-2023."[6] Testimony

---

[6] In 1996, the Commission issued a final decision that requires, in part, all Wisconsin natural gas utilities to file a gas supply plan annually for approval by the Commission. *Investigation on the Commission's Own Motion Into the Need for Changes in Tariff Terms and Conditions Concerning the Purchased Gas Adjustment Mechanism*, Final Decision, Docket 5-GI-106, 1996 WL 34720600 at *14 (Wis. P.S.C. Nov. 5, 1996). The plan must cover a minimum of three years and include annual sales, capacity, commodity, and capacity release forecasts. *Id.* The Commission explained its need for the information, in part, as follows:

(continued)

from the record established that for gas supply plans, the Commission generally requires natural gas utilities to maintain a five-percent margin in their gas supply contracts.

¶16    In the final decision, the Commission emphasized its "responsibility to ensure that Wisconsin utility customers receive adequate, reliable, and economical gas service, now and in the future."  As to the reserve-margin, the Commission observed:

> "[T]he Commission requires utilities to have a sufficient amount of capacity to supply firm customers with natural gas under extreme weather conditions" and "a target reserve margin of approximately 5.00 percent is included to cover unanticipated growth, forecasting errors, unexpected conditions, or system upsets." …. Such a reserve margin is necessary because "[i]f the actual firm gas demand is greater than the pipeline transportation capacity into an area, those firm gas customers may be subject to curtailment, in which they lose access to natural gas."

¶17    The Commission, however, does not always require natural gas utilities to maintain a five-percent reserve margin.  Indeed, as the Commission explained in its final decision, when it approved the Utilities' most recent gas

---

> In order to provide safe and adequate service, utilities must provide *reliable* service.  Most utility space heating customers are firm customers who do not have backup fuels to use during periods of interruption of gas service.  Service interruptions occurring during periods of extremely cold weather can deprive such customers of heat for extended periods of time and can be life-threatening, especially for the extremely young or elderly.  Although a gas utility cannot guarantee that service interruptions will not occur due to circumstances beyond its control, … reliable service can generally be provided by a utility having at its disposal, and under reasonable terms, sufficient firm capacity and sufficient firm supply resources (including gas-in-storage) necessary to meet its firm customers' needs.

*Id.* at *4.

supply plans, "the reserve margin for [the Utilities] was slightly lower than what the Commission consider[ed] to be an adequate reserve margin." The record also established the Commission has approved a range of reserve margins in other cases, from as low as two percent to as high as five percent.

¶18    Before the Commission, Sierra argued "the Commission cannot apply a 5.0 percent reserve margin for natural gas in the instant docket without first adopting it by rule, and, thus, cannot consider such a reserve margin when evaluating the capacity gap that constitutes much of the need for the proposed project." The Commission rejected Sierra's assertion that the five-percent reserve margin used in this case was a rule. It explained that "[t]he 5.0 percent reserve margin is a planning target, not an enforceable standard or threshold."

> The Commission finds that the 5.0 percent reserve margin is a well-established planning target, based on the Commission's decades of experienc[e] administering the gas supply plan process. There is nothing in the record to support departing from the long-established, and prudent, requirement of a 5.0 percent reserve margin.

¶19    On appeal, Sierra maintains that the five-percent reserve margin used by the Commission is a statement of general policy that the Commission was required to promulgate as a rule before applying it to this specific case. We disagree.

¶20    WISCONSIN STAT. § 227.10(1) requires every agency to "promulgate as a rule each statement of general policy." However, "A statement of policy or an interpretation of a statute *made in the decision of a contested case* … does not render it a rule or constitute specific adoption of a rule and is not required to be promulgated as a rule." *Id.* (emphasis added). WISCONSIN STAT. § 227.01(13), in turn, defines "[r]ule" as "a regulation, standard, statement of policy, or general

11

order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." A "[r]ule," however, does not include "a decision or order in a contested case." Sec. 227.01(13)b. It also does not include "an order directed to a specifically named person or to a group of specifically named persons that does not constitute a general class, and which is served on the person or persons to whom it is directed by the appropriate means applicable to the order." Sec. 227.01(13)c.

¶21 Here, the Commission must ensure that Utilities "furnish reasonably adequate service and facilities." *See* WIS. STAT. § 196.03(1). In the context of this contested case, the Commission's decision to use a five-percent reserve margin is not an unpromulgated rule. *See* WIS. STAT. §§ 227.10(1); 227.01(13)b.-c. It is a factual decision based on the Commission's experience, technical competence, and specialized knowledge that was made in the context of this hearing and thus does not fall under the statutory definition of a rule. *See* § 227.01(13)b. It is also a decision applicable only to the Utilities as part of a review of this specific application. *See* § 227.01(13)c.

¶22 Sierra, nevertheless, analogizes this situation to *Lamar*, 389 Wis. 2d 486. There, the court determined the Department of Transportation ("DOT") developed a new and contradictory interpretation of a statute that regulated billboards. *Id.*, ¶¶11, 13, 23. Although the DOT previously permitted certain billboard violations to be cured, it changed its position in Lamar's case, asserting it was "correcting for a previously erroneous understanding of the law." *Id.*, ¶14. The court, however, explained that the DOT's new interpretation of law required

12

rulemaking and the DOT could not subvert that requirement by simply announcing its new interpretation in a contested case. *Id.*, ¶¶23, 39.

¶23    Sierra argues the Commission's use of a five-percent reserve margin is analogous to the DOT's new interpretation of a statute because "[b]oth were applied to decide a contested case hearing." We disagree. As this record establishes, although the Commission's target reserve may be five percent, it does not apply that reserve percentage in every case before it. This was a factual determination specific to this case. It was not a pronouncement that all applications under WIS. STAT. § 196.49 include a five-percent reserve margin. There may be factual situations in the context of contested cases where the reserve percentage varies. The five-percent reserve margin is not a "[r]ule." *See* WIS. STAT. §§ 227.10(1); 227.01(13)b.-c.

### B.  Forecasted load projections and capacity gap

¶24    Sierra next argues there are errors in the forecasted load projections and capacity gap that the Commission relied on to determine the facilities were needed. There are two components to this argument. First, Sierra argues the Utilities near-term C&I load forecast contained improper assumptions about a large customer's impact and the Commission erred by relying on these forecasts. Second, Sierra argues that when addressing the capacity shortfall, the Utilities failed to include capacity from their existing LNG facility in Oak Creek and the Commission erred by overlooking this source of capacity. We address each factual determination in turn.

## 1. Near-term C&I load forecast

¶25    In its initial brief to the Commission, Sierra asserted that the Utilities' load projections for one of the proposed facilities "assume[d] a very large new industrial customer and a significant amount of additional induced load growth in the supply chain and residential loads." According to Sierra, this customer's assumed new load on the Utilities' forecasts "represent[ed] 29% of [the Utilities'] projected need for the LNG project." Sierra theorized the only potential industrial customer who could have the impact projected by the Utilities was Foxconn; however, Foxconn had not lived up to those expectations. Sierra wanted the Commission to require the Utilities to modify their near-term C&I load forecasts.

¶26    The Utilities responded that the forecasts did not need to be revised. In support, the Utilities offered Kevin Kuse, a gas commodity contract administrator, who testified about how the forecasts were developed. Kuse explained the "C&I load is only one component of the overall load forecast and does not materially drive [the Utilities'] need for the LNG Project." He elaborated that the forecast

> is based on anticipated peak demand. This peak demand forecast includes … 1) natural growth over time, 2) known changes in firm demand due to customers changing between firm customer rates and transport rates, 3) *changes due to new customer load* and 4) the loss of existing customer load. …. It is important to understand that these drivers work in concert. No one of these four factors alone, *including new customer load requirements*, are responsible for the need for additional peak day capacity. Specifically, known or expected additions to our customer base represent just one component of the overall demand forecast. This forecasted demand (based on all four components) along with the overall gas supply are used to determine whether additional resources, such as the proposed LNG Project, are needed to meet the peak day forecast.

When asked specifically about this large customer and to what extent this customer's natural gas needs played in the Utilities' overall demand forecast, Kuse responded "[t]he customer … although large, represents merely approximately 2% of [the Utilities'] capacity requirements and is not a meaningful driver of the need for the LNG Project to meet peak-day demand."

¶27    The Commission rejected Sierra's proposal to require the Utilities to modify their near-term C&I load forecasts.[7]  The Commission noted the parties' positions but ultimately determined "the analysis and load forecast that was done is acceptable and the weight of the evidence demonstrates that it is reasonable."

¶28    On appeal, Sierra argues the Commission's factual determination is not reasonable.  As stated earlier, we will uphold the Commission's findings of fact as long as they are supported by substantial evidence in the record.  *See* WIS. STAT. § 227.57(6).  "The test is whether, taking into account all of the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.'" ***Kitten v. DWD***, 2002 WI 54, ¶5, 252 Wis. 2d 561, 644 N.W.2d 649 (citation omitted).  "The findings of an administrative agency do not even need to reflect a preponderance of the evidence as long as the agency's conclusions are reasonable." ***Id.***  "If the factual findings of the administrative body are reasonable, they will be upheld." ***Id.***

¶29    Here, it is clear from the record that the Commission recognized the factual dispute in the Utilities' load forecasts and determined the Utilities' load forecasts were acceptable.  The record established that the C&I load is only one

---

[7]  Commissioner Tyler Huebner dissented from this determination.

component of the Utilities' overall forecasts. We conclude the Commission's determination to rely on the Utilities' load forecasts was reasonable. *See id.*

### 2. Oak Creek LNG facility

¶30     The Utilities also own a LNG facility in Oak Creek that has been in service since 1965. The facility was taken out of service for inspection pursuant to a Commission order. The Utilities, when addressing the capacity shortfall and the need for the proposed project, assumed this facility was permanently retired and unavailable. Sierra argued this assumption was improper because the record did not establish the Oak Creek facility would be retired from service following the inspection. On appeal, Sierra argues the Commission improperly "assum[ed] that the Oak Creek Storage Facility provides no future capacity." (Capitalization omitted.)

¶31     We disagree. The final decision establishes that the Commission considered the capacity at the Oak Creek facility and determined there would still be a capacity gap. The decision explains:

> Commission staff analyzed all three load growth forecast scenarios presented by the [Utilities], a low case, a base case, and a high case forecast and found that all three firm peak demand forecast scenarios "showed both applicants under the 5.00 percent reserve margin." …. Commission staff also concluded that "regardless of whether the forecast is done using the conservative growth rate or high growth rate, and *with [Oak Creek LNG facility] in service*, both forecasts demonstrate that additional capacity of some type is needed."

(Emphasis added.)

¶32     Sierra then seemingly acknowledges the Commission *did* consider the capacity at the Oak Creek facility because it argues "the Final Decision's

16

assertion that 'additional capacity of some type is needed' even with the Oak Creek facility's capacity rests on several unsupported and incorrect assumptions." Specifically, Sierra contends that *if* the load forecasts are recalculated and *if* there is no five-percent reserve margin and *if* the Commission assumed Oak Creek's capacity was what it was historically as opposed to what it was in the last few years, then perhaps there would not be a capacity gap that would justify the project.

¶33    This argument, however, is based on two arguments we have already rejected and nothing more than a request to reweigh the evidence in this case. *See* WIS. STAT. § 227.57(6) ("[T]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact."). Sierra has not established that the Commission's factual determination that "with [Oak Creek LNG facility] in service, both forecasts demonstrate that additional capacity of some type is needed," is unreasonable and not supported by the record. *See **Kitten***, 252 Wis. 2d 561, ¶5.

### III.    Energy Priorities Law

¶34    Finally, Sierra argues the Commission committed an error of law in its consideration of the Energy Priorities Law ("EPL"). "The EPL states Wisconsin's energy policy and gives agencies and governmental units a list of energy source options and the priority in which they should be considered when making decisions." ***Clean Wisconsin, Inc. v. PSC***, 2005 WI 93, ¶98, 282 Wis. 2d 250, 700 N.W.2d 768. The relevant part of the EPL states:

> **(4)** PRIORITIES. In meeting energy demands, the policy of the state is that, to the extent cost-effective and technically feasible, options be considered based on the following priorities, in the order listed:

> (a) Energy conservation and efficiency.
>
> (b) Noncombustible renewable energy resources.
>
> (c) Combustible renewable energy resources.
>
> (cm) Advanced nuclear energy using a reactor design or amended reactor design approved after December 31, 2010, by the U.S. Nuclear Regulatory Commission.
>
> (d) Nonrenewable combustible energy resources, in the order listed:
>
> 1. Natural gas.

WIS. STAT. § 1.12(4).

¶35     When the Commission makes a determination on an application for a certificate of authority under WIS. STAT. § 196.49, it applies the EPL in the context of determining whether to approve the requested project. *See **Clean Wisconsin***, 282 Wis. 2d 250, ¶122. "[It] should ask … :  Given the requirements of [§ 196.49], what is the highest priority energy option that is also cost effective and technically feasible?" *See **id.***; *see also* WIS. STAT. § 196.025(1)(ar) ("[T]o the extent cost-effective, technically feasible and environmentally sound, the commission shall implement the priorities under [the EPL] in making all energy-related decisions and orders, including strategic energy assessment, rate setting and rule-making orders.").

¶36     The Utilities specifically addressed the EPL in their application for the project.  They recognized the proposed project was for natural gas storage facilities that would be used to meet the capacity gap needed during peak demand (the coldest days of winter).  They explained energy efficiency and conservation were built into their forecast models because, even assuming the most conservative growth, the Utilities still faced a capacity gap.  The Utilities considered other alternatives such as "expanding interstate pipeline capacity and

firm gas supplies," however, they believed the proposed peaking facilities were more cost effective and provide "a much better fit as a supply source … since there are typically only a handful of days a year in which demand rises to these levels." The Utilities also explained that "Given the magnitude of the need for additional capacity and supply," "additional conservation activities, renewable resources, or any other energy priorities listed in [the EPL] cannot provide a means to provide additional capacity and supply in the area."

¶37 Before the Commission, Sierra was critical of the Utilities' consideration of the EPL. Sierra, in turn, proposed various efficiency and demand response options to address the Utilities' capacity gap, such as temperature-controlled interruptible tariffs and technology such as smart thermostats, smart gas meters, and electric heat pumps. The Utilities responded and offered evidence as to why these solutions were not feasible.[8]

¶38 In its final decision, the Commission outlined the parties' positions as to whether energy efficiency and conservation could close the capacity cap. The Commission observed:

> The [Utilities] responded to Sierra Club's statements by suggesting that the demand-side alternatives proposed by Sierra Club are not deployable in the necessary timeframe

---

[8] For example, the Utilities pointed out that the temperature-controlled tariff idea was based on a New York City tariff, but that Wisconsin's coldest days are over 30% colder than New York City's, the Utilities' customers live in primarily rural and suburban communities (not New York City), and the Utilities do not have the necessary meters to implement the same tariff. The Utilities also provided evidence that consumers who maintained electric heat pumps as a primary heating source would also need to maintain natural gas furnaces as a back-up heat source when temperatures dropped below five degrees Fahrenheit, which happens frequently during Wisconsin winters. The Utilities emphasized their "peak-day design … is *negative* 20[ degrees]" Fahrenheit. Additionally, the Utilities observed that although Sierra proposed electric heat pumps, Sierra's expert did not know how many heat pumps would need to be installed and at what cost in order to close the Utilities' capacity gap.

> to meet the forecasted peak day natural gas demand …. Sierra Club's expert witness even noted that the while the "untapped potential of cost-effective energy efficiency … is many times the difference between [the Utilities'] base and low demand forecast," … the peak load can still only be reduced to being "very close" to the critical load for need, with the largest gap between demand and secured capacity only a few years away …. It still is not enough. Sierra Club argued that its proposed demand-side alternatives would bridge such a capacity gap, but there is nothing in the record demonstrating that such demand-side alternatives are truly feasible at a scale necessary to truly, and safely, make up for such a capacity gap.

¶39 Ultimately, the Commission determined the Utilities' project "complie[d] with the state energy policies on prioritization of fuel choices and the promotion of energy conservation and efficiency." It found the "record in this case did not demonstrate any technically feasible or cost-effective alternatives to the proposed project." It emphasized it was bound by its "statutory obligation to ensure the residents of Wisconsin have a safe, reliable, cost-effective, and environmentally responsible supply of power" and "[i]f an alternative to a project is not proven as being capable of meeting the specific need that is being addressed, then it fails to be a feasible alternative." The Commission concluded:

> [T]here are no alternatives in the record of the instant docket that meet the requirements of the WIS. STAT. §§ 196.025(1)(ar) and [the EPL]. Commission staff would have had to make a number of ill-advised assumptions to find that some of the proposed alternatives were feasible, and such speculation cannot be allowed when there is demonstrated project need such as in the instant docket.

¶40 On appeal, Sierra argues the Commission "improperly shifted the burden to Sierra Club to prove that the proposed LNG facilities do not comply with the Energy Priorities Law, rather than requiring the [Utilities] to prove that it does." (Capitalization omitted.) We disagree.

¶41     The record established that the Utilities offered alternatives that demonstrated their project complied with the EPL, Sierra responded with additional alternatives for higher-ranked priorities, the Utilities considered those alternatives and offered evidence demonstrating those alternatives were not feasible or cost-effective to meet the capacity gap, and the Commission ultimately agreed with the Utilities and determined the project complied with the EPL. *See* WIS. STAT. § 196.025(1)(ar).  We conclude the Commission's consideration of the EPL was proper and is supported by the record.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.